FILED
2014 Jun-05  PM 05:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **WILLIE JAMES JOHNSON, as** | ) | |
| **Personal Representative of the** | ) | |
| **Estate of Louis Blackmon,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | **1:13-CV-1712-VEH** |
| **v.** | ) | |
| | ) | |
| **CHRYSLER CANADA INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This is a civil action filed by the plaintiff, Willie James Johnson, as personal representative of the estate of Lois Blackmon, deceased. The complaint alleges that Blackmon was driving a 2006 Chrysler 300 (LX) "designed, developed, manufactured, tested, marketed, distributed, and sold" by defendant Chrysler Canada, Inc. ("Chrysler Canada")[1], when she was killed after the vehicle "was struck on the driver's side by a tractor trailer." (Doc. 1 at 3). The complaint alleges that the defendant is liable under the Alabama Extended Manufacturer's Liability Doctrine (the "AEMLD") (Count One). It also alleges liability based on theories of negligence

---

[1] Originally, the plaintiff sued, and made these allegations against, both Chrysler Canada and "Chrysler Group, LLC." (Doc. 1). On October 8, 2013, the plaintiff gave notice that he wished to dismiss Chrysler Group, LLC without prejudice. (Doc. 6). October 9, 2013, the court dismissed Chrysler Group, LLC without prejudice. (Doc. 7).

(Counts Two and Three), wantonness (Counts Four and Five), and breach of warranty (Count Six).

The case comes before the court on the defendant's motion to dismiss for lack of personal jurisdiction, filed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. (Doc. 10). For the reasons stated herein the motion will be **DENIED**.

## I.   STANDARD

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Technologies Corp. v. Mazer (Mazer)*, 556 F.3d 1260, 1274 (11th Cir. 2009). "Where . . . the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction. *Mazer*, 556 F.3d at 1274 (internal quotations and citations omitted). "A prima facie case is established if the plaintiff presents affidavits or deposition testimony sufficient to defeat a motion for judgment as a matter of law." *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010). "The district court must resolve the challenge—on the pleadings, if possible, or following an evidentiary hearing before the bench or, depending on the circumstances, at trial." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1224 n. 19 (11th Cir. 2009) (citing 5C

2

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1373 (3d ed. 2004)). In resolving the challenge the court notes that

> where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff. If such inferences are sufficient to defeat a motion for judgment as a matter of law, the court must rule for the plaintiff, finding that jurisdiction exists.

*PVC Windoors*, 598 F.3d at 810 (quotes and citations omitted). "It goes without saying that, where the defendant challenges the court's exercise of jurisdiction over its person, the plaintiff bears the ultimate burden of establishing that personal jurisdiction is present." *Oldfield*, 558 F.3d at 1217.

## II.  FACTS

The facts of this case are straightforward and undisputed. On or about September 22, 2011, the plaintiff's decedent, Lois Blackmon, died after the 2006 Chrysler 300 (LX) vehicle she was driving was involved in an accident. The complaint alleges that Chrysler Canada "designed, developed, manufactured, tested, marketed, distributed, and sold" the vehicle. (Doc. 1 at 3). The plaintiff claims "that his decedent's fatal injuries would have been reduced or eliminated had the subject vehicle been reasonably crashworthy, been equipped with side curtain airbags and side impact protection, including side/torso airbags." (Doc. 28 at 4).

Chrysler Canada is a Canadian corporation with its headquarters in Windsor,

Ontario, Canada. (Doc. 1 at 2; doc. 10 at 2). It has never been licensed to do business

in Alabama, and has not

     – transacted any business in Alabama;

     – been involved in any business activities in Alabama;

     – paid any taxes to Alabama;

     – made any contracts with Alabama;

     – owned, used, or possessed any real estate situated in Alabama;

     – maintained any offices, manufacturing plants, or equipment in Alabama;

     – had any directors, officers, employees, or agents based in Alabama;

     – had a bank account in Alabama;

     – had a telephone number, mailing address, or Employee Identification Number ("EIN") based in Alabama; or

     – directed any advertizing or marketing efforts to residents or business in the United States, including Alabama.

(Doc. 10-1 at 3).

     Chrysler Canada is an indirect wholly owned subsidiary of Chrysler Group

LLC. (Doc. 10-1 at 3; doc. 29-3 at 5). Previously it was an indirect wholly owned

subsidiary of Chrysler LLC (now bankrupt), formerly DaimlerChrysler Company

LLC, formerly DaimlerChrysler Corporation, formerly Chrysler Corporation. (Doc.

10-1 at 3). The defendant refers to Chrysler LLC, DaimlerChrysler Company LLC,

DaimlerChrysler Corporation, and Chrysler Corporation collectively as "Chrysler United States." The court will as well.

Chrysler Canada manufactured/assembled[2] the vehicle Blackmon was driving. (Doc. 10-1 at 4). The vehicle was assembled at the defendant's Brampton, Ontario, Canada facility. (Doc. 10-1 at 4; doc. 28 at 4). Chrysler Canada does not receive orders or payment from Alabama dealers, nor does it advertise, sell, or ship vehicles to Alabama or anywhere else in the United States. (Doc. 10-1 at 4, 5). Chrysler United States would instruct Chrysler Canada on the number and configuration of vehicles bound for the United States market, and Chrysler Canada would assemble the vehicles to those specifications. (Doc. 10-1 at 4). Each vehicle bound for the United States was built to the specific requirements of the United States market. (Doc. 30-9 at 1). Thereafter

> [a]ll vehicles assembled by Chrysler Canada that are destined for the United States market, including the [plaintiff's decedent's] . . . vehicle, are sold to Chrysler United States while the vehicle is still in Canada. The titles to all such vehicles are transferred in Canada. Chrysler United States takes possession of those vehicles while those vehicles are still in Canada. Chrysler United [S]tates imports vehicles it already owns into the United States.

(Doc. 10-1 at 4).

---

[2] In its brief, Chrysler Canada uses the term "assembled" instead of "manufactured." (Doc. 10 at 2 ("Chrysler Canada merely assembled the vehicle, in Canada . . .")). The terms are interchangeable for the purposes of this motion. *See* Black's Law Dictionary (6th ed.) 965 (defining "manufacturer" as an entity which "manufactures, assembles, or produces goods.") (emphasis added).

Blackmon's vehicle was one of the vehicles built by Chrysler Canada for the United States market. It was sold by Chrysler United States to Crown Dodge Chrysler Plymouth, in Gadsden, Alabama. (Doc. 29-5 at 2). At the time the vehicle was built, Chrysler Canada knew that Chrysler United States, through its dealer network, had a nationwide distribution channel in the United States. (Doc. 29-3). Further, as to each particular vehicle it manufactured, including Blackmon's, Chrysler Canada knew <u>that vehicle's</u> ultimate destination in the United States by virtue of the "sales code" or "dealer code" assigned to each vehicle. (Doc. 29-4 at 33, 106-107; doc. 29-5 at 11; doc. 29-3 at 4).[3] Chrysler Canada knew that a majority of the vehicles that it manufactured were sold in the United States. (Doc. 29-2 at 48-50; 29-3 at 16). It "expected that at least some of the vehicles it assembled would likely be sold in the [S]tate of Alabama." (Doc. 29-3 at 17; doc. 33 at 2). When it built Blackmon's vehicle, Chrysler Canada knew that it was bound for Alabama. It receives an income for all vehicles, including Blackmon's vehicle, which it manufactures, including those which are sold in the United States. (Doc. 29-2 at 67-68; doc. 33 at 2).

## III.   ANALYSIS

The Eleventh Circuit has noted:

A federal court sitting in diversity undertakes a two-step inquiry in

---

[3] Chrysler Canada would also affix a "Monroney" label to the vehicle which showed the vehicle's final destination. (Doc. 29-3 at 4; doc. 30-9 at 1-2).

> determining whether personal jurisdiction exists: the exercise of
> jurisdiction must (1) be appropriate under the state long-arm statute and
> (2) not violate the Due Process Clause of the Fourteenth Amendment to
> the United States Constitution.

*Mazer*, 556 F.3d at 1274. In this case, "the two inquiries merge, because Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible." *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007) (citing Ala. R. Civ. P. 4.2(b); *Sieber v. Campbell,* 810 So.2d 641, 644 (Ala.2001)). The Due Process Clause requires that the defendant have: 1) certain minimum contacts with the forum state, 2) such that the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The court will examine each part of the *International Shoe* analysis as it applies to the facts of this case.

### A.    Minimum Contacts

#### 1.    *Specific Versus General Jurisdiction*

There are two types of personal jurisdiction, specific and general. "Specific jurisdiction refers to 'jurisdiction over causes of action arising from or related to a defendant's actions within the forum.'" *PVC Windoors,*, 598 F.3d at 808 (emphasis added) *(quoting Oldfield v. Pueblo De Bahia Lora, S.A.,* 558 F.3d 1210, 1220 n. 27 (11th Cir.2009)). "In contrast, general jurisdiction refers to the power of the forum

state to exercise jurisdiction in any cause of action involving a particular defendant, regardless of where the cause of action arose." *PVC Windoors*, 598 F.3d at 810 n. 8 (emphasis added) (*citing Oldfield*, 558 F.3d at 1220 n. 27).[4] The plaintiff alleges that there is <u>specific</u> personal jurisdiction over the defendant.[5] (Doc. 28 at 9).

Referring to specific jurisdiction as a "more limited" basis of jurisdiction, the Supreme Court has noted:

> Where a defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, it submits to the judicial power of an otherwise foreign sovereign to the extent that power is exercised in connection with the defendant's activities touching on the State. In other words, submission through contact with and activity directed at a sovereign may justify specific jurisdiction in a suit arising out of or related to the defendant's contacts with the forum.

*J. McIntyre Mach., Ltd. v. Nicastro*, ____ U.S. ____, 131 S. Ct. 2780, 2787-88, 180 L. Ed. 2d 765 (2011) (internal quotations and citations omitted). In this case, Chrysler Canada lacks a presence within, and seems to lack direct contacts with, the State of Alabama. However, the plaintiff contends that Chrysler Canada has purposefully availed itself of the privilege of conducting activities in Alabama <u>and</u> has directed

---

[4] This type of jurisdiction exists where the defendant has "continuous and systematic" contacts with the state. The court looks for "circumstances, or a course of conduct, from which it is proper to infer an intention to benefit from and thus an intention to submit to the laws of the forum State. *McIntyre*, 131 S. Ct. at 2788.

[5] Because the plaintiff does not allege general jurisdiction, the court will not address the defendant's argument that there is no general jurisdiction over it. (Doc. 10 at 25).

contact towards Alabama, by placing the vehicles it assembles into the so-called "stream of commerce." Chrysler Canada argues that the Supreme Court has held that this basis for specific personal jurisdiction is no longer valid.  For the reasons set out herein, the court disagrees.  While the parameters of the "stream of commerce" basis for specific personal jurisdiction are not yet clearly defined, it is clear, under the facts of this case, that this court has specific personal jurisdiction over Chrysler Canada.[6]

## 2.   *The "Stream of Commerce" Theory In the Supreme Court*

As noted by the Third Circuit Court of Appeals,

[i]n many products-liability cases . . . the seller does not come in direct contact with the forum state but does so through intermediaries such as retailers or distributors. In response to this phenomenon, courts have developed the "stream of commerce" theory by which specific jurisdiction is asserted over a nonresident defendant which injected its goods, albeit indirectly, into the forum state and either "derived [a] substantial benefit from the forum state or had a reasonable expectation of [deriving a substantial benefit from it]."

*Pennzoil Products Co. v. Colelli & Associates, Inc*., 149 F.3d 197, 203 (3d Cir. 1998)

---

[6]   The Supreme Court has made clear that the existence of specific personal jurisdiction is determined on a case-by-case basis. *Kulko v. Superior Court of California In & For City & Cnty. of San Francisco*, 436 U.S. 84, 92, 98 S. Ct. 1690, 1697, 56 L. Ed. 2d 132 (1978) ("Like any standard that requires a determination of 'reasonableness,' the 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present."); *see also, AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1362 (Fed. Cir. 2012) ("[T]his court has assessed personal jurisdiction premised on the stream-of-commerce theory on a case-by-case basis by inquiring whether the particular facts of a case support the exercise of personal jurisdiction.").

(*quoting Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 300 (3d Cir. 1985)). The Supreme Court has addressed this theory in three cases: *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); and *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011).

> **a.** ***World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)**

In *World-Wide Volkswagen*, Harry and Kay Robinson had purchased a new Audi automobile from a company named Seaway Volkswagen, Inc. (Seaway), in Massena, N. Y., in 1976. The next year, the Robinson family left New York for a new home in Arizona. While driving through the State of Oklahoma, their Audi was struck in the rear by another car. The resulting fire severely burned Robinson and her two children.

The Robinsons subsequently brought a products-liability action in Oklahoma state court claiming that their injuries resulted from defective design and placement of the Audi's gas tank and fuel system. They joined as defendants the automobile's manufacturer, Audi NSU Auto Union Aktiengesellschaft (Audi); its importer Volkswagen of America, Inc. (Volkswagen); its regional distributor, World-Wide Volkswagen Corp. (World-Wide); and its retail dealer, Seaway, from which the

Robinsons had purchased the vehicle, in Massena, N. Y., in 1976. Seaway and World-Wide entered special appearances, claiming that Oklahoma's exercise of jurisdiction over them would offend the limitations on the state's jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment.

Justice White, writing for the majority, noted:

> The facts presented to the District Court showed that World-Wide is incorporated and has its business office in New York. It distributes vehicles, parts, and accessories, under contract with Volkswagen, to retail dealers in New York, New Jersey, and Connecticut. Seaway, one of these retail dealers, is incorporated and has its place of business in New York. Insofar as the record reveals, Seaway and World-Wide are fully independent corporations whose relations with each other and with Volkswagen and Audi are contractual only. Respondents adduced no evidence that either World-Wide or Seaway does any business in Oklahoma, ships or sells any products to or in that State, has an agent to receive process there, or purchases advertisements in any media calculated to reach Oklahoma. In fact, as respondents' counsel conceded at oral argument . . . there was no showing that any automobile sold by World-Wide or Seaway has ever entered Oklahoma with the single exception of the vehicle involved in the present case.

*World-Wide Volkswagen*, 444 U.S. at 288-89.

The Court first "reaffirmed" that "a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State." *Id.* at 291 (*citing International Shoe*, 326 U.S. at 316). It also noted that "the Due Process Clause 'does not contemplate that a state may make binding a judgment *in personam* against an

11

individual or corporate defendant with which the state has no contacts, ties, or

relations.'" *Id.* at 294 (*quoting International Shoe*, 326 U.S. at 319). It then found

> a total absence of those affiliating circumstances that are a necessary
> predicate to any exercise of state-court jurisdiction. [World-Wide and
> Seaway] carry on no activity whatsoever in Oklahoma. They close no
> sales and perform no services there. They avail themselves of none of
> the privileges and benefits of Oklahoma law. They solicit no business
> there either through salespersons or through advertising reasonably
> calculated to reach the State. Nor does the record show that they
> regularly sell cars at wholesale or retail to Oklahoma customers or
> residents or that they indirectly, through others, serve or seek to serve
> the Oklahoma market. In short, respondents seek to base jurisdiction on
> one, isolated occurrence and whatever inferences can be drawn
> therefrom: the fortuitous circumstance that a single Audi automobile,
> sold in New York to New York residents, happened to suffer an accident
> while passing through Oklahoma.

*Id.* at 295.

The plaintiffs in *World-Wide Volkswagen* argued that "because an automobile

is mobile by its very design and purpose it was 'foreseeable' that the Robinsons' Audi

would cause injury in Oklahoma." *Id.* at 296. In response, the court wrote that

"'foreseeability' <u>alone</u> has never been a sufficient benchmark for personal jurisdiction

under the Due Process Clause," otherwise

> a local California tire retailer could be forced to defend in Pennsylvania
> when a blowout occurs there, see *Erlanger Mills, Inc. v. Cohoes Fibre
> Mills, Inc.*, 239 F.2d 502, 507 (CA4 1956); a Wisconsin seller of a
> defective automobile jack could be haled before a distant court for
> damage caused in New Jersey, *Reilly v. Phil Tolkan Pontiac, Inc.*, 372
> F.Supp. 1205 (N.J.1974); or a Florida soft-drink concessionaire could
> be summoned to Alaska to account for injuries happening there, see

> *Uppgren v. Executive Aviation Services, Inc.*, 304 F.Supp. 165, 170–171
> (Minn.1969). Every seller of chattels would in effect appoint the chattel
> his agent for service of process. His amenability to suit would travel
> with the chattel.

*Id.* at 296. Then, using language that has given rise to the entire "stream of

commerce" debate, the Court continued, saying:

> This is not to say, of course, that foreseeability is wholly
> irrelevant. But the foreseeability that is critical to due process analysis
> is not the mere likelihood that a product will find its way into the forum
> State. Rather, it is that the defendant's conduct and connection with the
> forum State are such that he should reasonably anticipate being haled
> into court there.
>
> . . .
>
> [I]f the sale of a product of a manufacturer or distributor such as Audi
> or Volkswagen is not simply an isolated occurrence, but arises from the
> efforts of the manufacturer or distributor to serve directly or indirectly,
> the market for its product in other States, it is not unreasonable to
> subject it to suit in one of those States if its allegedly defective
> merchandise has there been the source of injury to its owner or to others.
> The forum State does not exceed its powers under the Due Process
> Clause if it asserts personal jurisdiction over a corporation that delivers
> its products into the stream of commerce with the expectation that they
> will be purchased by consumers in the forum State.

*Id.* at 297-98.[7] The Court then noted that "there is no such or similar basis for

---

[7]  Chrysler Canada argues that the quote is dicta, claiming that "the U.S. Supreme Court did not
analyze the case under a 'stream of commerce' theory." (Doc. 10 at 8; *see also*, doc. 10 at 9 (calling these
statements "speculation" regarding "circumstances not present before the court")). The court does not
agree. "[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then
before us." *United States v. Kaley*, 579 F.3d 1246, 1253 n. 10 (11th Cir. 2009) (internal quotations and
citations omitted). The Eleventh Circuit has noted:

> We have pointed out many times that regardless of what a court says in its opinion, the

Oklahoma jurisdiction over World-Wide or Seaway in this case." *Id.* at 298.

In a harbinger of things to come, Justice Brennan's dissent in *World-Wide Volkswagen* argued that

> [t]he essential inquiry in locating the constitutional limits on state-court jurisdiction over absent defendants is whether the particular exercise of jurisdiction offends traditional notions of fair play and substantial justice. . . . The existence of contacts, so long as there were some, was merely one way of giving content to the determination of fairness and reasonableness.
>
>     Surely *International Shoe* contemplated that the significance of the contacts necessary to support jurisdiction would diminish if some other consideration helped establish that jurisdiction would be fair and reasonable. The interests of the State and other parties in proceeding

---

decision can hold nothing beyond the facts of that case. *E.g., Watts v. BellSouth Telecomms., Inc.,* 316 F.3d 1203, 1207 (11th Cir.2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); *United States v. Aguillard,* 217 F.3d 1319, 1321 (11th Cir.2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision." (quotation marks omitted)). All statements that go beyond the facts of the case—and sometimes, but not always, they begin with the word "if"—are dicta. *See, e.g., United States v. Eggersdorf,* 126 F.3d 1318, 1322 n. 4 (11th Cir.1997) ("[L]anguage in ... [an opinion] not necessary to deciding the case then before us" is dicta); *Moon v. Head,* 285 F.3d 1301, 1318 (11th Cir.2002) (Carnes, J., concurring) ("Those statements are dicta. They are dicta because they go beyond the facts of the [earlier] case itself...."). And dicta is not binding on anyone for any purpose. *See, e.g., McNely v. Ocala Star–Banner Corp.,* 99 F.3d 1068, 1077 (11th Cir.1996) ("[W]e are not required to follow dicta contained in our own precedents .... "); *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller,* 957 F.2d 1575, 1578 (11th Cir.1992) (because what is said in a prior opinion about a question not presented there is dicta, and dicta is not binding precedent, a later panel is "free to give that question fresh consideration").

*Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010). The quoted discussion by the Court does not go beyond the facts before it and is necessary to resolve the case. The stream of commerce issue was raised by the plaintiffs in *World-Wide Volkswagen*, and the Court necessarily addressed it. These statements explain why it was not reasonable to exercise jurisdiction over the defendants in that case under the stream of commerce theory.

14

with the case in a particular forum are such considerations. . . .

> Another consideration is the actual burden a defendant must bear in defending the suit in the forum. *McGee, supra.* Because lesser burdens reduce the unfairness to the defendant, jurisdiction may be justified despite less significant contacts.

*Id.* at 300-301 (Brennan, J. dissenting). After determining that the interest of the

forum State and its connection to the litigation were "strong," Brennan wrote:

> The petitioners are not unconnected with the forum. Although both sell automobiles within limited sales territories, each sold the automobile which in fact was driven to Oklahoma where it was involved in an accident. It may be true, as the Court suggests, that each sincerely intended to limit its commercial impact to the limited territory, and that each intended to accept the benefits and protection of the laws only of those States within the territory. But obviously these were unrealistic hopes that cannot be treated as an automatic constitutional shield.

> An automobile simply is not a stationary item or one designed to be used in one place. An automobile is *intended* to be moved around. Someone in the business of selling large numbers of automobiles can hardly plead ignorance of their mobility or pretend that the automobiles stay put after they are sold. It is not merely that a dealer in automobiles foresees that they will move. The dealer actually intends that the purchasers will use the automobiles to travel to distant States where the dealer does not directly "do business." The sale of an automobile does *purposefully* inject the vehicle into the stream of interstate commerce so that it can travel to distant States.

> The stream of commerce is just as natural a force as a stream of water, and it was equally predictable that the cars petitioners released would reach distant States. . . .

> The Court accepts that a State may exercise jurisdiction over a distributor which "serves" that State "indirectly" by "deliver[ing] its products into the stream of commerce with the expectation that they will

be purchased by consumers in the forum State." It is difficult to see why the Constitution should distinguish between a case involving goods which reach a distant State through a chain of distribution and a case involving goods which reach the same State because a consumer, using them as the dealer knew the customer would, took them there. In each case the seller purposefully injects the goods into the stream of commerce and those goods predictably are used in the forum State.

*Id.* at 305-07 (italics in original).

   **b.   *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)**

In *Asahi*, Gary Zurcher was severely injured, and his passenger and wife, Ruth Ann Moreno, was killed, when Zurcher lost control of his Honda motorcycle and collided with a tractor. The accident occurred in Solano County, California. Zurcher filed a product liability action in California state court and alleged that the accident was caused "by a sudden loss of air and an explosion in the rear tire of the motorcycle, and alleged that the motorcycle tire, tube, and sealant were defective." *Asahi*, 480 U.S. at 106. The complaint named, *inter alia,* Cheng Shin Rubber Industrial Co., Ltd. (Cheng Shin), the Taiwanese manufacturer of the tube. Cheng Shin filed a cross-complaint seeking indemnification from its co-defendants and from petitioner, Asahi Metal Industry Co., Ltd. (Asahi), the Japanese manufacturer of the tube's valve assembly. The Court noted:

Asahi . . . manufactures tire valve assemblies in Japan and sells the assemblies to Cheng Shin, and to several other tire manufacturers, for

16

use as components in finished tire tubes. Asahi's sales to Cheng Shin took place in Taiwan. The shipments from Asahi to Cheng Shin were sent from Japan to Taiwan. Cheng Shin bought and incorporated into its tire tubes 150,000 Asahi valve assemblies in 1978; 500,000 in 1979; 500,000 in 1980; 100,000 in 1981; and 100,000 in 1982. Sales to Cheng Shin accounted for 1.24 percent of Asahi's income in 1981 and 0.44 percent in 1982. Cheng Shin alleged that approximately 20 percent of its sales in the United States are in California. Cheng Shin purchases valve assemblies from other suppliers as well, and sells finished tubes throughout the world.

*Id.*

Writing for four of the justices, Justice O'Connor first noted that, although *World-Wide Volkswagen* rejected "foreseeability" that a mobile product might enter the forum as a basis for jurisdiction, "[t]he Court disclaimed, however, the idea that 'foreseeability is wholly irrelevant' to personal jurisdiction, concluding that '[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297-298). Justice O'Connor then noted that

> [s]ome courts have understood the Due Process Clause, as interpreted in *World-Wide Volkswagen,* to allow an exercise of personal jurisdiction to be based on no more than the defendant's act of placing the product in the stream of commerce.

*Id.* at 110. Under this approach, there would be personal jurisdiction "because the

stream of commerce eventually brought some valves Asahi sold Cheng Shin into

California," and "Asahi[] [was aware] that its valves would be sold in California." *Id.*

at 110-111. Justice O'Connor also noted that

> Other courts have understood the Due Process Clause and the above-quoted language in *World-Wide Volkswagen* to require the action of the defendant to be more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce.

*Id.* at 110.

Justice O'Connor, and three justices who adopted her opinion, took the latter

approach, writing:

> The substantial connection between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.
>
> Assuming, *arguendo,* that respondents have established Asahi's awareness that some of the valves sold to Cheng Shin would be incorporated into tire tubes sold in California, respondents have not demonstrated any action by Asahi to purposefully avail itself of the California market. Asahi does not do business in California. It has no

office, agents, employees, or property in California. It does not advertise or otherwise solicit business in California. It did not create, control, or employ the distribution system that brought its valves to California. There is no evidence that Asahi designed its product in anticipation of sales in California. On the basis of these facts, the exertion of personal jurisdiction over Asahi by the Superior Court of California[*] exceeds the limits of due process.

*Id.* at 112-13 (internal quotes and citations omitted). Justice O'Connor's view has become known as the "stream of commerce plus" test.

Justice Brennan, writing for himself and three other justices, would have required nothing more than the defendant's knowledge that the product would ultimately end up in the forum. He wrote:

The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State.

*Id.* at 117. He then, citing to his own dissent from *World-Wide Volkswagen*, wrote:

The Court in *World-Wide Volkswagen* thus took great care to distinguish "between a case involving goods which reach a distant State through a chain of distribution and a case involving goods which reach the same State because a consumer ... took them there."

*Id.* at 120 (citations omitted). Justice Brennan then concluded:

> [a]lthough Asahi did not design or control the system of distribution that carried its valve assemblies into California, Asahi was aware of the distribution system's operation, and it knew that it would benefit economically from the sale in California of products incorporating its components. Accordingly, I cannot join [Justice O'Connor's opinion] that Asahi's regular and extensive sales of component parts to a manufacturer it knew was making regular sales of the final product in California is insufficient to establish minimum contacts with California.

*Id.* at 121.

As no stream of commerce approach garnered a majority, the issue remained unsettled.[8]

### c.   *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011)

In *McIntyre*, the Court was faced with an appeal from the Supreme Court of New Jersey, which, having essentially adopted Justice Brennan's approach from *Asahi*,

> held that New Jersey's courts can exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states.

*McIntyre*, 131 S. Ct. at 2785 (original quotes and citations omitted). In that case, Robert Nicastro seriously injured his hand in New Jersey while using a metal-

---

[8] The case was resolved on the basis of the "fairness" aspect of the *International Shoe* analysis.

shearing machine manufactured in England by J. McIntyre Machinery, Ltd. (J. McIntyre). J. McIntyre is incorporated and operates in England. Writing for himself and three other justices, Justice Kennedy noted the following additional facts:

> First, an independent company agreed to sell J. McIntyre's machines in the United States. J. McIntyre itself did not sell its machines to buyers in this country beyond the U.S. distributor, and there is no allegation that the distributor was under J. McIntyre's control. Second, J. McIntyre officials attended annual conventions for the scrap recycling industry to advertise J. McIntyre's machines alongside the distributor. The conventions took place in various States, but never in New Jersey. Third, no more than four machines (the record suggests only one), including the machine that caused the injuries that are the basis for this suit, ended up in New Jersey. In addition to these facts emphasized by petitioner, the New Jersey Supreme Court noted that J. McIntyre held both United States and European patents on its recycling technology. It also noted that the U.S. distributor "structured [its] advertising and sales efforts in accordance with" J. McIntyre's "direction and guidance whenever possible," and that "at least some of the machines were sold on consignment to" the distributor.

*McIntyre*, 131 S. Ct. at 2786. Justice Kennedy also noted that J. McIntyre "at no time either marketed goods in the State or shipped them there." *Id.* at 2786.

Justice Kennedy rejected the New Jersey Supreme Court's broad stream of commerce approach, writing:

> The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign. In other words, the defendant must purposefully avai[l] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. Sometimes a defendant does so by sending its goods rather than its agents. The defendant's transmission of goods permits the exercise of jurisdiction only where the

> defendant can be said to have targeted the forum; as a general rule, it is
> not enough that the defendant might have predicted that its goods will
> reach the forum State.

*Id.* at 2788 (citations omitted). He then noted that, in *Asahi*, Justice Brennan had

"discarded the central concept of sovereign authority in favor of considerations of

fairness and foreseeability," based on the premise "that the defendant's ability to

anticipate suit renders the assertion of jurisdiction fair. In this way, the opinion made

foreseeability the touchstone of jurisdiction." *Id.* at 2788. Justice Kennedy then stated

that "[t]his Court's precedents make clear that it is the defendant's actions, not his

expectations, that empower a State's courts to subject him to judgment," and noted

that "jurisdiction is in the first instance a question of authority rather than fairness."

*Id.* Justice Kennedy wrote that Justice Brennan's opinion, "advocating a rule based

on general notions of fairness and foreseeability, is inconsistent with the premises of

lawful judicial power." *Id.* at 2789.

Justice Breyer, writing for himself and Justice Alito, agreed that the New Jersey

court could not constitutionally exercise jurisdiction. However, he stated:

> In my view, the outcome of this case is determined by our
> precedents.
>
> . . .
>
> In asserting jurisdiction over the British Manufacturer, the
> Supreme Court of New Jersey relied most heavily on three primary facts
> as providing constitutionally sufficient "contacts" with New Jersey,

thereby making it fundamentally fair to hale the British Manufacturer before its courts: (1) The American Distributor on one occasion sold and shipped one machine to a New Jersey customer, namely, Mr. Nicastro's employer, Mr. Curcio; (2) the British Manufacturer permitted, indeed wanted, its independent American Distributor to sell its machines to anyone in America willing to buy them; and (3) representatives of the British Manufacturer attended trade shows in "such cities as Chicago, Las Vegas, New Orleans, Orlando, San Diego, and San Francisco." In my view, these facts do not provide contacts between the British firm and the State of New Jersey constitutionally sufficient to support New Jersey's assertion of jurisdiction in this case.

*Id.* at 2791. In explaining this decision, Justice Breyer was first clear that

[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient. Rather, this Court's previous holdings suggest the contrary. The Court has held that a single sale to a customer who takes an accident-causing product to a different State (where the accident takes place) is not a sufficient basis for asserting jurisdiction. See *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). And the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place. See *Asahi Metal Industry Co. v. Superior Court of Cal., Solano Cty.,* 480 U.S. 102, 111, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (opinion of O'Connor, J.) (requiring "something more" than simply placing "a product into the stream of commerce," even if defendant is "awar[e]" that the stream "may or will sweep the product into the forum State"); *id.,* at 117, 107 S.Ct. 1026 (Brennan, J., concurring in part and concurring in judgment) (jurisdiction should lie where a sale in a State is part of "the regular and anticipated flow" of commerce into the State, but not where that sale is only an "edd[y]," *i.e.,* an isolated occurrence); *id.,* at 122, 107 S.Ct. 1026 (Stevens, J., concurring in part and concurring in judgment) (indicating that "the volume, the value, and the hazardous character" of a good may affect the jurisdictional inquiry and emphasizing Asahi's "regular course

23

of dealing").

Here, the relevant facts found by the New Jersey Supreme Court show no "regular ... flow" or "regular course" of sales in New Jersey; and there is no "something more," such as special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer "purposefully avail[ed] itself of the privilege of conducting activities" within New Jersey, or that it delivered its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users. *World–Wide Volkswagen, supra,* at 297–298, 100 S.Ct. 559 (internal quotation marks omitted).

*Id.* at 2791-92 (alterations in original).

Justice Breyer did not like the plurality's "strict rules that limit jurisdiction where a defendant does not 'inten[d] to submit to the power of a sovereign' and cannot 'be said to have targeted the forum.'" *Id.* at 2793 (alterations in original) (quoting *id.* at 2788). He noted

[W]hat do those standards mean when a company targets the world by selling products from its Web site? And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders? And what if the company markets its products through popup advertisements that it knows will be viewed in a forum? Those issues have serious commercial consequences but are totally absent in this case.

*Id.* at 2793 (alteration supplied) (parenthetical in original). On the other hand, he was

not

persuaded by the absolute approach adopted by the New Jersey Supreme Court and urged by respondent and his *amici*. Under that view, a producer is subject to jurisdiction for a products-liability action so long as it "knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states." [*Nicastro v. McIntyre Mach. Am., Ltd.*, 201 N.J. 48, 75-76, 987 A.2d 575, 591 (2010)] (emphasis added). In the context of this case, I cannot agree.

For one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum,* and the litigation," it is fair, in light of the defendant's contacts *with that forum,* to subject the defendant to suit there. *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (emphasis added). It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum State. But this Court has rejected the notion that a defendant's amenability to suit "travel[s] with the chattel." *World–Wide Volkswagen,* 444 U.S., at 296, 100 S.Ct. 559.

For another, I cannot reconcile so automatic a rule with the constitutional demand for "minimum contacts" and "purposefu[l] avail[ment]," each of which rest upon a particular notion of defendant-focused fairness. *Id.,* at 291, 297, 100 S.Ct. 559 (internal quotation marks omitted). A rule like the New Jersey Supreme Court's would permit every State to assert jurisdiction in a products-liability suit against any domestic manufacturer who sells its products (made anywhere in the United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue. What might appear fair in the case of a large manufacturer which specifically seeks, or expects, an equal-sized distributor to sell its product in a distant State might seem unfair in the case of a small manufacturer (say, an Appalachian potter) who sells his product (cups and saucers) exclusively to a large distributor, who resells a single item (a coffee mug) to a buyer from a distant State (Hawaii). I know too little about the range of these or in-between possibilities to abandon in favor of the more absolute rule what has previously been this Court's less

absolute approach.

Further, the fact that the defendant is a foreign, rather than a domestic, manufacturer makes the basic fairness of an absolute rule yet more uncertain. I am again less certain than is the New Jersey Supreme Court that the nature of international commerce has changed so significantly as to require a new approach to personal jurisdiction.

It may be that a larger firm can readily "alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *World–Wide Volkswagen, supra,* at 297, 100 S.Ct. 559. But manufacturers come in many shapes and sizes. It may be fundamentally unfair to require a small Egyptian shirt maker, a Brazilian manufacturing cooperative, or a Kenyan coffee farmer, selling its products through international distributors, to respond to products-liability tort suits in virtually every State in the United States, even those in respect to which the foreign firm has no connection at all but the sale of a single (allegedly defective) good. And a rule like the New Jersey Supreme Court suggests would require every product manufacturer, large or small, selling to American distributors to understand not only the tort law of every State, but also the wide variance in the way courts within different States apply that law. See, *e.g.,* Dept. of Justice, Bureau of Justice Statistics Bulletin, Tort Trials and Verdicts in Large Counties, 2001, p. 11 (reporting percentage of plaintiff winners in tort trials among 46 populous counties, ranging from 17.9% (Worcester, Mass.) to 69.1% (Milwaukee, Wis.)).

*Id.* at 2793-94 (alteration supplied).

In the end, however, Justice Breyer was clear that he "would not work such a change to the law in the way either the plurality or the New Jersey Supreme Court suggests without a better understanding of the relevant contemporary commercial circumstances." *Id.* at 2794.

Justices Ginsburg, Sotomayor, and Kagan joined in a dissent, concluding that,
based on the defendant's conduct, jurisdiction existed.

### 3.   *McIntyre Does Not Change the Law*

"When a fragmented Court decides a case and no single rationale explaining
the result enjoys the assent of five Justices, the holding of the Court may be viewed
as that position taken by those Members who concurred in the judgments on the
narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993,
51 L. Ed. 2d 260 (1977). Because Justice Breyer concurred on the narrowest grounds,
in applying the *McIntyre* case, courts have generally considered his concurrence as
the holding of the Court. *Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356,
1366 (M.D. Fla. 2013) (Steele, J.); *Simmons v. Big No. 1 Motor Sports, Inc.*, 908 F.
Supp. 2d 1224, 1229 (N.D. Ala. 2012) (Proctor, J.). Still, the exact state of the law
after *McIntyre* is unclear, because, as the Tennessee Supreme Court has noted, "[l]ike
one of Dr. Rorschach's amorphous ink blots, Justice Breyer's opinion is susceptible
to multiple interpretations." *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d
726, 759 (Tenn. 2013).

The Eleventh Circuit has not examined the stream of commerce theory since
*McIntyre*. However, two circuit courts, the Fifth Circuit and the Federal Circuit, have.
In *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 179 (5th Cir. 2013) cert. denied,

134 S. Ct. 644, 187 L. Ed. 2d 420 (U.S. 2013), the Fifth Circuit noted that "Justice Breyer's concurrence was explicitly based on Supreme Court precedent and on *McIntyre's* specific facts," and refused to agree that it forecloses use of the stream of commerce approach. Similarly, in *AFTG-TG, LLC v. Nuvoton Tech. Corp. (Nuvoton)*, 689 F.3d 1358, 1363 (Fed. Cir. 2012), the Federal Circuit noted that

> the crux of Justice Breyer's concurrence was that the Supreme Court's framework applying the stream-of-commerce theory—including the conflicting articulations of that theory in *Asahi*—had not changed, and that the defendant's activities in *McIntyre* failed to establish personal jurisdiction under any articulation of that theory.
>
> Because *McIntyre* did not produce a majority opinion, we must follow the narrowest holding among the plurality opinions in that case. *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). The narrowest holding is that which can be distilled from Justice Breyer's concurrence—that the law remains the same after *McIntyre.*

*Nuvoton*, 689 F.3d at 1363.

Many district courts which have considered this issue also agree that the law has not changed. *See, Hatton*, 937 F. Supp. 2d at 1366 ("[M]ost district courts which have analyzed the issue disagree [that the law has changed.]"); *Wausau Underwriters Ins. Co. v. Osborne Transformer Corp.*, 11-CV-819A, 2013 WL 6328104 at *9 (W.D.N.Y. Dec. 5, 2013) (McCarthy, M.J.) (noting that the law remains the same); *Simmons*, 908 F. Supp. 2d at 1228-29 (N.D. Ala. 2012) (noting that most district courts which have analyzed *McIntyre* disagree with the proposition that it changed

the analysis in this area); *Fed. Ins. Co. v. Steris Corp.*, 11-CV-00078 SRN/AJB, 2012 WL 5187790 at *6 (D. Minn. Oct. 19, 2012) (Nelson, J.) ("[T]he law remains the same after *McIntyre*."); *Eskridge v. Pac. Cycle, Inc.*, 2:11-CV-00615, 2012 WL 1036826 at *4 (S.D.W. Va. Mar. 27, 2012) (Goodwin, J.) ("Because [*McIntyre*] did not produce a majority opinion adopting either Justice O'Connor's or Justice Brennan's stream of commerce theory, and given Justice Breyer's reliance on current Supreme Court precedent, post-*Asahi* Fourth Circuit case law remains binding."); *Askue v. Aurora Corp. of Am.*, 1:10-CV-0948-JEC, 2012 WL 843939 at *7 (N.D. Ga. Mar. 12, 2012) (Carnes, C.J.) ("Justice Breyer's opinion purports to rely on existing precedent to reach its conclusion."); *In re Chinese Manufactured Drywall Products Liab. Litig.*, 894 F. Supp. 2d 819, 849 (E.D. La. 2012) (Fallon, J.) *aff'd*, 742 F.3d 576 (5th Cir. 2014) ("Justice Breyer's concurrence, the governing decision, expressly requires the application of existing Supreme Court precedent on specific personal jurisdiction, leaving unaltered the pre-[]*McIntyre* jurisprudence[.]"); *Ainsworth v. Cargotec USA, Inc.*, 2:10-CV-236-KS-MTP, 2011 WL 6291812 at *2 (S.D. Miss. Dec. 15, 2011) (Starrett, J.) (limiting *McIntyre* to its facts); *Lindsey v. Cargotec USA, Inc.*, 4:09CV-00071-JHM, 2011 WL 4587583 at *7 (W.D. Ky. Sept. 30, 2011) (McKinley, J.) ("Because the Supreme Court in *McIntyre* did not conclusively 'define the breadth and scope of the stream of commerce theory, as there was not a majority

consensus on a singular test,' . . . and given Justice Breyer's decision to rely on

current Supreme Court precedents, the Court will continue to adhere to the Sixth

Circuit's analysis of purposeful availment.").[9]

By contrast, some courts view *McIntyre* as a change in controlling law. For

example, Judge Kallon, in this district, noted that

> Justice Breyer's concurrence agreed [with the plurality] in *rejecting* the
> "absolute" argument that, as a general rule, "a producer *is* subject to
> jurisdiction for a products-liability action so long as it knows or
> reasonably should know that its products are distributed through a
> nationwide distribution system that *might* lead to those products being
> sold in any of the fifty states." Perhaps most importantly, both Justice
> Breyer['s] and Justice Kennedy's opinions appear to focus on the
> "contemporary commercial circumstances," *id.* at 2794 (Breyer, J.,
> concurring), or the "economic realities of the market the defendant seeks
> to serve," *id.* at 2790.

*King v. Gen. Motors Corp.*, 5:11-CV-2269-AKK, 2012 WL 1340066 at *6 (N.D. Ala.

Apr. 18, 2012) (Kallon, J.) (alteration supplied).[10] Other courts have come to similar

conclusions. *See, Monje v. Spin Master Inc.*, CV-09-1713-PHX-GMS, 2013 WL

2369888 at *6 (D. Ariz. May 29, 2013) (Snow, J.) ("Justice Breyer endorsed Justice

O'Connor's formulation of the stream of commerce theory in *Asahi.* He was looking

---

[9] Similarly the Tennessee Supreme Court recently held that "*McIntyre* [] merely preserves the doctrinal status quo. Few courts have felt compelled to alter their approach to personal jurisdiction in response to []*McIntyre.*" *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 758 (Tenn. 2013) (") (citing cases).

[10] In *King*, the court concluded that specific personal jurisdiction existed under a similar set of facts involving "General Motors Canada" and its United States counterpart, "General Motors Corporation." *See* note 13 *infra*.

for something more and could not find it in the record in []*McIntyre*. And his opinion is the governing opinion under *Marks*—the narrowest grounds for concurrence were the absence of 'something more' than merely placing a product in the stream of commerce."); *Sebring v. Air Equip. & Eng'g, Inc.*, 988 N.E.2d 272, 280 (Ind. Ct. App. 2013) (noting both that Justice Breyer disagreed with the rule employed by the New Jersey Supreme court and that the reason that Justice Breyer found that Nicastro had not met his burden of proof was because he felt that something more than simply placing a product into the stream of commerce was required for specific jurisdiction to exist); *Smith v. Teledyne Cont'l Motors, Inc.*, 840 F. Supp. 2d 927, 929 (D.S.C. 2012) (Bertelsman, S.J.) (interpreting *McIntyre* as adopting Justice O'Connor's approach in *Asahi*); *Read v. Moe*, 899 F. Supp. 2d 1024, 1032 (W.D. Wash. 2012) (Jones, J.) ("[Breyer's] opinion also eschewed the approach of the New Jersey Supreme Court, an approach that in many respects resembled Justice Brennan's opinion in *Asahi*."); *Windsor v. Spinner Indus. Co., Ltd.*, 825 F. Supp. 2d 632, 638 (D. Md. 2011) (Bredar, J.) ("*McIntyre* clearly rejects foreseeability as the standard for personal jurisdiction. Although the concurrence and the plurality differ as to what might constitute 'purposeful availment' in the context of national or global marketing, they both firmly embrace the continuing significance of individual state sovereignty and, on that basis, hold that specific jurisdiction must arise from a defendant's

deliberate connection with the forum state. That holding now commands the assent of six Justices of the Supreme Court, all on substantially the same grounds, and is therefore binding precedent."); *N. Ins. Co. of New York v. Constr. Navale Bordeaux*, 11-60462-CV, 2011 WL 2682950 at *5 (S.D. Fla. July 11, 2011) (Cohn, J.) (citing *McIntyre* for the principal that "'something more'" than merely placing a product into the stream of commerce is required for personal jurisdiction."); *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F.Supp.2d 501, 516 (D.N.J.2011) (Wolfson, J.) ("Neither knowledge [n]or expectation of sales to a particular forum state is enough to establish jurisdiction according to both the plurality opinion and the concurring opinion [in *McIntyre*].").

Having considered the positions and rationale of all of the cases above, the court is persuaded by the opinions of the Fifth and Federal Circuits, and the other courts which have held that Justice Breyer's opinion is limited to the facts of *McIntyre*. He was clear that the outcome of *McIntyre* was "determined by our precedents," *McIntyre*, 131 S. Ct. at 2791, could be resolved using "this Court's previous holdings," *id.* at 2792, and that "resolving this case requires no more than adhering to our precedents." *Id.* He stated that he "would not go further," and that *McIntyre* "is an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules." *Id.* at 2792-93. Accordingly, the court agrees with the

courts which have found that *McIntyre* merely maintained the status quo, and will apply Eleventh Circuit law as it existed prior to *McIntyre*.

**4.     *"Stream of Commerce" in the Eleventh Circuit as Applied to the Facts of this Case***

The Eleventh Circuit has considered this jurisdictional issue, in a product-liability context, only three times post-*Asahi*.[11]  The cases are: *Morris v. SSE, Inc.*, 843 F.2d 489, 493 (11th Cir. 1988); *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993); and *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc. (Merritt)*, 207 F.3d 1351, 1357 (11th Cir. 2000). After reviewing these cases, the court agrees that "[r]elevant Eleventh Circuit case law is unclear which test it would adopt." *Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356, 1365 (M.D. Fla. 2013); *see also, Simmons v. Big No. 1 Motor Sports, Inc.*, 908 F. Supp. 2d 1224, 1228 (N.D. Ala. 2012) ("It is unclear which of the two tests the Eleventh Circuit endorses under the facts of this case.").

---

[11] This court has found no other post-*Asahi* Eleventh Circuit opinion on this issue. Some decisions refer to various jurisdictional tests without specifically adopting one. *See, e.g., Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cnty.*, 221 F.3d 1211, 1217-18 (11th Cir. 2000) (non-products liability case) (citing *Asahi* for the proposition that, even if defendant was aware product would eventually reach forum state via stream of commerce, this awareness does not constitute an act purposefully directed toward forum state.); *Olivier v. Merritt Dredging Co., Inc.*, 954 F.2d 1553, 1560 *opinion withdrawn and superseded on denial of reh'g*, 979 F.2d 827 (11th Cir. 1992) (non-products liability case) (Johnson, S.J. dissenting) ("[T]his portion of the majority's reasoning smacks of the 'stream of commerce' theory of minimum contacts that was rejected by a plurality of the Supreme Court in *Asahi Metal Indus. v. Superior Court*, 480 U.S. 102, 108-13, 107 S.Ct. 1026, 1030-33, 94 L.Ed.2d 92 (1987)."). Many other Eleventh Circuit cases mention *Asahi*. However, the court's research has found that only *Morris*, *Vermeulen*, and *Ruiz de Molina* address this issue in the context of <u>both</u> existing Supreme Court precedent <u>and</u> the facts of a products liability case.

In *Morris*, the court applied O'Connor's view only "[f]or the limited purpose of resolving th[at] case," because it was "the narrowest of the . . . *Asahi* views." *Morris*, 843 F.2d at 496. It noted that it was more efficient to do so because "[n]ecessarily, if personal jurisdiction exists under the narrower O'Connor test, it exists under the broader . . . tests." *Id.* The *Morris* panel did not specifically adopt either approach. Similarly, in *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir. 1993), the court stated "because jurisdiction in the United States over [the defendant] . . . is consistent with due process under the more stringent 'stream of commerce plus' analysis adopted by the *Asahi* plurality, we need not determine which standard actually controls this case." *Vermeulen*, 985 F. 2d 1548 (emphasis added).

Interestingly, the *Vermeulen* court, in a footnote, also stated: "We note, however, that in the absence of further guidance from the Supreme Court, several courts have declined to follow the *Asahi* plurality's analysis, and have instead continued to apply the 'stream of commerce' approach adopted in *World–Wide Volkswagen*." *Id.* Then, in *Ruiz de Molina*, the court appeared to follow suit, citing only *World-Wide Volkswagen*, and writing:

> Direct contact by a nonresident defendant with the forum is not required. The Supreme Court has held that a nonresident defendant may be subject to specific jurisdiction even if his actions giving rise to the suit occurred outside the forum state and he had no direct contact with the plaintiff. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The Court stated that the

"forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its product into the stream of commerce with the expectation that it will be purchased by consumers in the forum State." *Id.*

The stream of commerce test for jurisdiction is met if the nonresident's product is purchased by or delivered to a consumer in the forum state, so long as the nonresident[]'s conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there for claims arising out of that conduct. *Id.*

*Ruiz de Molina*, 207 F.3d at 1357.

However, these statements from *Vermeulen* and *Ruiz de Molina* really add nothing to this court's analysis because the parameters of the so-called "test" from *World-Wide Volkswagen* have never been clear. The problem, as Justice O'Connor noted in *Asahi*, was that courts did not agree over what types of conduct, connections, and/or knowledge on behalf of the defendant, satisfies this constitutional limit. Even the Supreme Court, after two attempts, has not been able to reach a consensus.[12]

---

[12] *World-Wide Volkswagen* is useful because it is an example of a case where the facts did not support jurisdiction under the stream of commerce approach. The court notes that the distinctions between the facts of *World-Wide Volkswagen* (where the court did not find jurisdiction) and the instant case suggest that here there is a much stronger case for jurisdiction. Part of the rationale for finding no jurisdiction in *World-Wide Volkswagen* was that there was no evidence that the defendants

regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma.

*World-Wide Volkswagen*, 444 U.S. at 295 (emphasis supplied). The presence in Alabama of the vehicle in the instant case can hardly be said to be fortuitous or isolated. Chrysler Canada at all times knew that most of the vehicles it was manufacturing would be sold in the United States and at least some would be

This confusion has not prevented at least one court in the Middle District of Florida from recently finding that Chrysler Canada was subject to jurisdiction under nearly identical facts as the instant case. In *Hatton v. Chrysler Canada*, 937 F. Supp. 2d 1356 (2013), Judge Steele first noted that, after *Morris*, *Vermeulen*, and *Ruiz de Molina*, "[r]elevant Eleventh Circuit case law is unclear which test it would adopt under this set of facts." *Hatton*, 937 F. Supp. 2d at 1365. Then, citing *World-Wide Volkswagen*, he held

> that Chrysler Canada purposely availed itself of the protections of the State of Florida. Chrysler Canada assembled the subject Chrysler 300 M for Chrysler United States, which distributes nationally in the United States, and therefore Chrysler Canada invoked the benefits and protections of those states, including Florida. *World–Wide Volkswagen Corp.,* 444 U.S. at 297, 100 S.Ct. 559. Therefore, "it is not unreasonable to subject [defendant] to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." *Id.*

*Id.* at 1366. Similarly, in *Simmons v. Big No. 1 Motor Sports, Inc.,* 908 F. Supp. 2d 1224 (N.D. Ala. 2012), Judge Proctor, who also found the law to be unclear after *Morris*, *Vermeulen*, and *Ruiz de Molina*, cited only *World-Wide Volkswagen*, noting:

> By designing the [product] for a manufacturer that distributes nationally

---

sold in Alabama. Indeed, it knew, at the time it manufactured <u>the very car in question,</u> that it would be sold <u>in Alabama.</u> Further, in *World-Wide Volkswagen* the defendants only received "marginal revenues"  from Oklahoma because the vehicles they sold were "capable of use" in that state. *Id.* at 299. Here, Chrysler Canada received direct revenue for vehicles it manufactured <u>specifically to be sold in Alabama.</u> In the instant case, the vehicles were not only "capable" of being used in Alabama, they <u>were made to be sold in Alabama.</u> Thus, the facts of the instant case hit closer to the mark set by *World-Wide Volkswagen,* wherever that mark is, than the facts of *World-Wide Volkswagen* itself.

in the United States, [the defendant] thereby invoked the benefits and protections of those states, including Alabama. *World–Wide,* 444 U.S. at 297, 100 S.Ct. 559. Therefore, "it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." *Id.*

*Simmons,* 908 F. Supp. 2d at 1229.[13]

---

[13] The defendant argues that *Hatton* and *Simmons* were wrongly decided because they "improperly apply a 'stream of commerce' based analysis as a substitute for the forum-specific and defendant-specific 'minimum contacts' mandate that has been repeatedly upheld by a majority of the Supreme Court." (Doc. 10 at 18, n. 12). As the court explains above, *World-Wide Volkswagen's* stream of commerce test has been adopted in this circuit, and has not been rejected by the Supreme Court.

A significant portion of the defendant's brief also argues that this court should ignore Judge Kallon's decision in *King v. General Motors Corp.*, No. 5:11-cv-2269-AKK, 2012 WL 1340066 (April 18, 2012). (Doc. 10 at 19-22). The defendant in *King* was General Motors of Canada, Ltd. ("GM Canada") which, like Chrysler Canada, also assembled vehicles in Canada. As in the instant case, those vehicles were then sold to GM Canada's parent company, GM Corporation, for sale in the United States. Judge Kallon found that the plurality and Breyer's concurrence both discussed "contemporary commercial circumstances," and the "economic realities of the market the defendant seeks to serve" and wrote:

Taking the facts presented in the light most favorable to King, the "contemporary commercial circumstances" and "economic realities of the market" GM Canada "seek[s] to serve," reveal that this court may exercise jurisdiction. Unlike the manufacture[r] in *McIntyre* who utilized an independent U.S. distributor that merely distributed four machines to the state of New Jersey, GM Canada utilized its parent corporation to distribute hundreds, if not thousands, of vehicles to the state of Alabama, including the vehicle at issue. While the court certainly recognizes that GM Canada is a separate and distinct entity from GM Corporation, there is no doubt that GM Canada "seeks to serve" Alabama when it specifically manufactures GM vehicles, in compliance with federal regulations, and designed by its parent corporation who actively sold these vehicles to an Alabama dealership. Indeed, GM Canada cannot plead ignorance of the markets it explicitly targets and serves when its parent corporation directly sells the manufactured products to these markets. GM Canada possesses more than some vague awareness that its products *might* reach U.S. markets—it manufacture[s] vehicles, such as the one at issue, to comply with federal regulations. This equates [to] manufacturing a product "in anticipation of sales in" Alabama. *See Asahi,* 480 U.S. at 113. Moreover, . . . [w]hile GM Canada and GM Corporation may not have created a written distribution agreement, the sale to GM Corporation was clearly not a sale to an end-user. Indeed, the court finds that this commercial relationship mirrors an example provided by Justice O'Connor in *Asahi* of a manufacturer "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." 480 U.S. at 112.

. . . Here, GM Canada, the entity who built certain vehicles for GM Corporation

Judge Steele's and Judge Proctor's opinions seem to suggest a broad approach to the stream of commerce test. The court agrees with, and finds persuasive, Judge Steele's opinion in *Hatton*. Under a broad stream of commerce approach, there is jurisdiction over Chrysler Canada.

The facts of the instant case <u>also</u> satisfy Justice O'Connor's more narrow "stream of commerce plus" test. This is not the case of a mere "placement of a product into the stream of commerce, without more." *Asahi*, 480 U.S. at 112. The United States market, including Alabama, is Chrysler Canada's main market. It is where most of the vehicles Chrysler Canada makes are sold. It is paid for each vehicle it makes, and thus reaps a considerable benefit from this market, which includes Alabama.[14] It is aware that the vehicles it makes are shipped through the dealership

─────────────────────────

to distribute specifically in the United States, including Alabama, cannot genuinely maintain that it does not serve the Alabama market. Stated differently, if not Alabama, what market does GM Canada serve? As one of these vehicles gave rise to the current cause of action, the economic realities of GM Canada and GM Corporation's commercial relationship establish sufficient "minimum contacts" with Alabama to demonstrate a targeting of Alabama's commercial automobile market and evidence that GM Canada purposefully availed itself to the benefits and privileges of this market. *See McIntyre,* 131 S.Ct. at 2790.

*King*, 2012 WL 1340066 at *7.

The defendant argues that the court should not be persuaded by *King* because its "analysis was incomplete, and . . . its result is incompatible with Supreme Court precedent." (Doc. 10 at 19). However, this court interprets Judge Kallon's reference to "contemporary commercial circumstances," and the "economic realities of the market the defendant seeks to serve," as merely another way of saying that the defendant has <u>indirectly</u> serviced the Alabama market—an approach that expressly was allowed by *World-Wide Volkswagen*.

[14] The defendant calls this an "economics-based gloss" which, it says, was rejected by *World-Wide Volkswagen*. (Doc. 10 at 19). The court does not agree. In *World-Wide Volkswagen* the argument was

channels of Chrysler United States, and, at the time it makes a vehicle, it knows the

exact location in the United States where each vehicle it makes will be shipped.

Examples of "something more" provided by Justice O'Connor included "designing

the product for the market in the forum State," and/or "marketing the product through

a distributor who has agreed to serve as the sales agent in the forum State." *Id.* at 112-

113. The conduct by Chrysler Canada in this case (manufacturing the allegedly

defective vehicle to the specifications of the United States market, and using Chrysler

---

rejected <u>on the facts of that case</u>.  The Court wrote:

> [The plaintiff's] argument seems to make the point that the purchase of
> automobiles in New York, from which the petitioners earn substantial revenue, would not
> occur *but for* the fact that the automobiles are capable of use in distant States like
> Oklahoma. Respondents observe that the very purpose of an automobile is to travel, and
> that travel of automobiles sold by petitioners is facilitated by an extensive chain of
> Volkswagen service centers throughout the country, including some in Oklahoma.
> <u>However, financial benefits accruing to the defendant from a collateral relation to the
> forum State will not support jurisdiction if they do not stem from a constitutionally
> cognizable contact with that State</u>. See *Kulko v. California Superior Court*, 436 U.S., at
> 94–95, 98 S.Ct., at 1698–1699. In our view, whatever marginal revenues petitioners may
> receive by virtue of the fact that their products are capable of use in Oklahoma is far too
> attenuated a contact to justify that State's exercise of *in personam* jurisdiction over them.

*World-Wide Volkswagen,* 444 U.S. at 298-99 (emphasis supplied). The contact in the instant case is not
so "attenuated;" rather it is "constitutionally cognizable." Here, Chrysler Canada received direct revenue
for vehicles it manufactured <u>specifically to be sold in Alabama</u>. In the instant case, the vehicles were not
only "capable" of being used in Alabama, they <u>were used, and were made to be sold, in Alabama.</u> The
defendant argues that "[s]imply stated, indirect revenue cannot, itself, create 'constitutionally cognizable'
minimum contacts." (Doc. 10 at 20). This court agrees. However, *World-Wide Volkswagen* and prior
Supreme Court precedent make clear that jurisdiction can "arise[] from the efforts of the manufacturer or
distributor to serve directly or indirectly, the market for its product in other States." *Id.* at 297. There is
a strong argument that Chrysler Canada, at least indirectly, sought to serve the Alabama market and should
be subjected to jurisdiction in Alabama. Because such an approach is allowed under *World-Wide
Volkswagen*, the court rejects Chrysler Canada's arguments that a finding of personal jurisdiction over it
necessarily is based on improperly imputing a principal's conduct to its agent. (Doc. 10 at 21; doc. 33 at
4-6).

United States to distribute it specifically in Alabama) appears to the undersigned to fit within these examples. *See, King*, 2012 WL 1340066 at *7.

The court also finds persuasive the Illinois Court of Appeals decision in *Soria v. Chrysler Canada, Inc.*, 958 N.E.2d 285 (Il. App. 2011), again dealing with the exact issue and identical defendant as the instant case.[15] The *Soria* court noted:

> Here, Chrysler Canada argues that there is no evidence of minimum contacts between it and Illinois. It asserts that its *mere awareness* that vehicles it assembles might be distributed by Chrysler United States to Illinois does not show sufficient minimum contacts. Plaintiff responds that Chrysler Canada has sufficient minimum contacts and is subject to specific personal jurisdiction in Illinois because it *knows* that the vehicles it assembles for Chrysler United States enter Illinois through the stream of commerce and because it intentionally serves the United States market, including Illinois, by indirectly shipping its vehicles here.

*Soria*, 958 N.E.2d at 293. After an in-depth discussion analyzing all of the pertinent Supreme Court cases, including *McIntyre*, the court wrote:

> Here, we conclude that, under either version of the stream-of-commerce theory, the trial court correctly found that sufficient minimum contacts exist to exercise personal jurisdiction over Chrysler Canada. Chrysler Canada is not only aware that its products are distributed in Illinois (thus satisfying the narrow stream-of-commerce theory), but it has also purposefully directed its activities toward Illinois (broad stream-of-commerce theory). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). "So long as a

---

[15] Chrysler Canada has not addressed this decision.

commercial actor's efforts are 'purposefully directed' toward residents of another State, [the Supreme Court has] consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774–75, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Contacts with the forum state that are " 'random,' " " 'fortuitous,' " or " 'attenuated' " will not be sufficient to establish that exercise of that state's jurisdiction was foreseeable to the defendant. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (quoting *Keeton,* 465 U.S. at 774, 104 S.Ct. 1473). The United States market, including Illinois, is Chrysler Canada's primary market. Masse's deposition testimony and affidavit reflect that Chrysler Canada is aware that 82% of its production (albeit not all of which consists of Plymouth Voyager minivans) is distributed, through an established distribution channel, within the United States. During the relevant period, Chrysler Canada indirectly shipped products into the American market, including Illinois, through Chrysler United States, its parent corporation. We agree with plaintiff's assertion that Chrysler Canada continuously and intentionally serves or targets this market and is set up to manufacture vehicles for (and derives significant revenue from) the United States market, including Chrysler dealerships throughout Illinois. Chrysler Canada concedes that, during 2008 and 2009, Chrysler United States ordered 28,383 total vehicles of various makes and models, including minivans, for its independently-owned dealerships in Illinois.

Further, to the extent that the broad stream-of-commerce theory is viable following *McIntyre,* we note that . . . Chrysler Canada is specifically *aware* of the final *destination* of *every product* (*i.e.,* vehicle) that it assembles. In its answers to interrogatories, Chrysler Canada stated that it was aware of the number of vehicles it assembled that contained Illinois addresses on the "Ship To" fields of the vehicles' Monroney labels or shipping orders and that it "expected" that some of its vehicles would be sold in Illinois. Thus, Chrysler Canada had an expectation that its products would be purchased by Illinois consumers and, given the continuous nature of its assembly relationship with Chrysler United States, its contacts with Illinois were not random, fortuitous, or attenuated.

41

. . .

> In summary, Chrysler Canada had sufficient minimum contacts such that it was fairly warned that it may be haled into an Illinois court.

*Id.* at 958 N.E.2d at 297-98. The court agrees with the *Soria* court's analysis and holds that it applies equally to the nearly identical facts in the instant case. Chrysler Canada has constitutionally cognizable contacts with the State of Alabama.

## B. Does the Maintenance of the Suit Offend "Traditional Notions of Fair Play and Substantial Justice?"

Once the plaintiff has established minimum contacts, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,* 593 F.3d 1249, 1267 (11th Cir.2010)); *see also Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. at 2184–85 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.").

> Several factors are relevant to this showing: (1) the defendant's burden; (2) the forum state's interest; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174; *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct.

42

559; *Madara,* 916 F.2d at 1517.

*Ruiz*, 207 F.3d at 1358. "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 858-59 (11th Cir. 1990) *(citing Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92 (1987); *Williams Electric Co.,* 854 F.2d at 393).

As to the first criteria, Chrysler Canada makes no argument that litigating here would be an inconvenience, except to state that "'[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" (Doc. 10 at 24 (*quoting Asahi*, 480 U.S. at 115)). It also, in a conclusory manner, states that there is a "great burden" on it. (Doc. 10 at 24). In the absence of any showing by Chrysler Canada, and in light of the fact that "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," *McGee,* 355 U.S. at 223, the court finds that this factor weighs in favor of jurisdiction.[16]

As to the second factor, Chrysler Canada argues only that it did not design, test,

---

[16] To the extent that Chrysler Canada argues that evidence it needs will be in the possession of other entities, such as Chrysler United States, Chrysler Canada will have this problem no matter where the case is heard.

or provide the warnings for the vehicle in question. (Doc. 10 at 23). First, this is a merits based defense, which should not be couched in terms of a jurisdictional argument. Further, Chrysler Canada ignores the claims that it is at fault for manufacturing the product.[17] Certainly Alabama has a substantial interest in protecting drivers in its state from unreasonably dangerous vehicles manufactured by Chrysler Canada. This factor too weighs in favor of jurisdiction.

Chrysler Canada provides no argument as to the remaining three factors. The court finds that these factors are either neutral, or weigh in favor of the plaintiff.

Chrysler Canada has failed to make a "compelling case" that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice. Further, after considering the facts and arguments presented, the court affirmatively finds that the exercise of jurisdiction over Chrysler Canada does not offend traditional notions of fair play and substantial justice.

---

[17] Chrysler Canada implies, but does not argue, that it is not a manufacturer, but merely an "assembler." (Doc. 10 at 23 ("To hold Chrysler Canada "liable in tort" . . . when Chrysler Canada merely assembled the product . . ..")). This argument is without merit. Under applicable law, the terms mean the same thing. See note 2, *supra*.

## IV.   CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss for lack of personal jurisdiction is **DENIED**.[18]

**DONE** and **ORDERED** this 5th day of June, 2014.

VIRGINIA EMERSON HOPKINS
United States District Judge

---

[18] The plaintiff's request for transfer (doc. 28 at 27) is **MOOT** in light of this court's holding.